```
          IN THE UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF MARYLAND
```

IVAN GOLDSTEIN                    *
                                  *
         v.                       *   Civil Action WMN-09-706
                                  *
THE LINCOLN NATIONAL LIFE         *
INSURANCE COMPANY                 *

    *    *    *    *    *    *    *    *    *    *    *    *

**MEMORANDUM**

Pending before this Court is Defendant's Motion for Summary Judgment, ECF No. 44.[1]  The parties have fully briefed the motion, and it is ripe for review.  Upon consideration of the pleadings, facts and applicable law, the Court determines that Defendant's Motion for Summary Judgment will be granted for the reasons set forth below.

**I.   INTRODUCTION**

This is a dispute regarding the cancellation of Plaintiff Ivan Goldstein's life insurance policy by Defendant Lincoln National Life Insurance Company (Lincoln National).  After failing to pay certain premiums, Lincoln National cancelled Mr. Goldstein's policy.  Mr. Goldstein applied to have the policy reinstated, but Lincoln National declined to do so.  Mr. Goldstein brought this action for breach of contract, alleging

---

[1] Also before the Court is Defendant's motion in limine to exclude certain testimony from trial, ECF No. 46.  As the Court will grant Defendant's summary judgment motion, it will deny as moot the motion in limine.

Lincoln National wrongfully terminated and then failed to properly reinstate his policy.

In 1985, Mr. Goldstein purchased a standard rate, non-tobacco "Flexible Premium Adjustable Life Insurance Policy" (Policy) from Jefferson-Pilot Life Insurance Company (Jefferson-Pilot). Jefferson-Pilot is a predecessor in interest to Lincoln National, as the two companies merged in 2007. Mr. Goldstein's Policy was a "universal life policy," which offered flexibility with respect to the payment of premiums. Subject to certain conditions, Mr. Goldstein was able to pay his semi-annual premiums in any amount and at any time. To the extent Mr. Goldstein paid into his Policy more money than was minimally required to maintain the Policy, the balance was deposited into an interest bearing account, the accrued value of which was the Policy's "cash value." As long as the cash value was sufficient to cover the monthly cost and fees of the Policy, the Policy remained in force.

For several years, Mr. Goldstein's semi-annual premium payments exceeded the Policy's cost, and his cash value accrued. Over time, however, two events conspired to deplete Mr. Goldstein's balance. First, the cost of the Policy was not fixed. Rather, it increased with Mr. Goldstein's age based on Lincoln National's expectations of interest, expenses, lapses, and Mr. Goldstein's future mortality. As a result, the cost of

the Policy eventually exceeded the semi-annual premiums Mr. Goldstein paid each year, at which time the Policy's cash value began to decline.

Despite ample notice that his payments would eventually become insufficient, Mr. Goldstein failed to increase his premiums. In 1998, Lincoln National sent a letter to Goldstein estimating that his Policy would remain solvent only until about 2004, unless he increased substantially the $1,950 semi-annual premium payments he was then paying. Yet, Mr. Goldstein continued to remit his semi-annual payments of $1,950, just as he had done since the Policy's inception in 1985. By December 2004 and roughly consistent with Lincoln National's estimation, the Policy's cash value was entirely depleted.

If and when Mr. Goldstein's cash value was insufficient to cover the Policy's monthly costs, the Policy provided for a sixty-day grace period within which Mr. Goldstein could make a minimum additional payment to keep the Policy in effect. The Policy also required Lincoln National to notify Mr. Goldstein of his deficiency at least thirty days prior to the end of the grace period. Thus, when administering Mr. Goldstein's Policy and others like it, Lincoln National's custom and practice was to mail "grace period notices" to delinquent policyholders twenty-five days after the first missed payment. The grace period notice informed the policyholder that his or her policy

was in danger of lapsing and instructed him or her to remit the minimum additional payment necessary to continue the policy.

In February 2005, Mr. Goldstein received his first grace period notice. To prevent a lapse, Mr. Goldstein remitted the minimum additional amount of money necessary to keep the Policy in force. The minimum payment, however, was sufficient only for the upcoming months. Moreover, Mr. Goldstein never increased his planned semi-annual premiums to rebuild his cash value, and thus between 2005 and mid-2007, his balance continued to hover around zero and he received several more grace period notices. Each time he paid the minimum amount necessary to avoid a lapse.

On July 3, 2007, Lincoln National allegedly mailed Mr. Goldstein another grace period notice (July 3rd Notice) advising him his cash value was insufficient to cover the monthly deduction of June 8, 2007, but Mr. Goldstein failed to remit the required minimum additional amount. In consequence, his Policy lapsed on August 7, 2007. On August 13, 2007, Lincoln National mailed Mr. Goldstein a lapse notice advising him his Policy was no longer in effect and informing him of his right, consistent with the terms of the Policy, to apply to have his Policy reinstated.

In response to the lapse, Mr. Goldstein quickly submitted an application for reinstatement along with a check to cover the overdue amount. After Mr. Goldstein later submitted additional

documentation, Lincoln National denied his application for reinstatement on December 13, 2007, because Mr. Goldstein no longer qualified for standard rate coverage under Lincoln National's objective underwriting standards.  Mr. Goldstein subsequently filed a complaint against Lincoln National with the Maryland Insurance Administration (MIA), but the MIA ruled in favor of Lincoln National.  Thereafter, Mr. Goldstein filed the instant lawsuit in the Circuit Court for Baltimore County, Maryland, alleging that Lincoln National both (1) wrongfully terminated the Policy because Mr. Goldstein never received a required grace period notice immediately prior to the Policy's lapse; and (2) wrongfully failed to reinstate his Policy despite Mr. Goldstein's alleged compliance with the Policy's requirements for reinstatement.  Lincoln National removed this case to federal court, and with discovery now complete, Lincoln National now moves the Court for summary judgment.

## II.  LEGAL STANDARD

Summary judgment is proper if the evidence before the court, consisting of the pleadings, depositions, answers to interrogatories, and admissions of record, establishes that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  A party seeking summary judgment bears the initial responsibility

of informing the court of the basis of its motion and identifying the portions of the opposing party's case which it believes demonstrate the absence of a genuine issue of material fact.  Id. at 323.  The non-moving party is entitled to have "all reasonable inferences . . . drawn in its respective favor." Felty v. Graves-Humphreys Co., 818 F.2d 1126, 1129 (4th Cir. 1987).

If the movant demonstrates that there is no genuine issue of material fact and that the movant is entitled to summary judgment as a matter of law, the non-moving party must, in order to withstand the motion for summary judgment, produce sufficient evidence in the form of depositions, affidavits, or other documentation which demonstrates that a triable issue of fact exists for trial.  Celotex, 477 U.S. at 324.  Unsupported speculation is insufficient to defeat a motion for summary judgment.  Felty, 818 F.2d at 1128 (citing Ash v. United Parcel Serv., Inc., 800 F.2d 409, 411-12 (4th Cir. 1986)). Furthermore, the mere existence of some factual dispute is insufficient to defeat a motion for summary judgment; there must be a genuine issue of material fact.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).  Thus, only disputes over those facts that might affect the outcome of the case under the governing law are considered to be "material."  Id.

**III. LINCOLN NATIONAL'S TERMINATION OF THE POLICY**

The gravamen of Mr. Goldstein's wrongful termination allegation is his contention that he did not receive in the mail the July 3rd Notice, which the Policy required before Lincoln National could terminate the Policy.  In Maryland, properly mailed material is entitled to a rebuttable presumption that the material was delivered and received.  <u>Benner v. Nationwide Mutual Ins. Co.</u>, 93 F.3d 1228, 1234 (4th Cir. 1996) (citing <u>Border v. Grooms</u>, 297 A.2d 81, 83 (Md. 1972); <u>McFerren v. Goldsmith-Stern Co.</u>, 113 A. 107, 109 (Md. 1921)).  Evidence of ordinary business practices concerning the mailing of notices is sufficient to prove the notices were properly mailed and therefore entitled to the presumption.  <u>Id.</u> (summarizing Maryland cases).  "While the presumption may be rebutted so as to create a question of fact, testimony by the addressee that he did not receive, or does not remember receiving, the material is not conclusive."  <u>Id.</u> at 1234-35.  The Court must consider the totality of the evidence in the case to determine whether the item was mailed and received.  <u>Id.</u> at 1235.

Although Maryland common law regarding the presumption of receipt of properly posted mail is well established, Mr. Goldstein encourages the Court to follow instead a single case from 1896.  Specifically, Mr. Goldstein points to <u>American Fire Ins. Co. v. Brooks</u>, 34 A. 373, 376 (Md. 1896), for the proposition that "receipt [by the policyholder of an insurance

7

policy cancellation notice] must be shown" when the notice is sent by mail.  Mr. Goldstein believes this language requires proof of actual receipt of mailed cancellation notices in such cases, thereby precluding reliance upon the presumption of receipt.  Assuming generously that Brooks remains an accurate recitation of the law, it lends only specious support to Mr. Goldstein's claim.  Because Brooks does not discuss the means by which a party must "show[]" receipt of a notice, it does not preclude reliance upon the presumption of receipt at issue here.

Mr. Goldstein also points to Fidelity & Casualty Co. of New York v. Riley, 178 A. 250, 252 (Md. 1935), presumably because it cites Brooks as authority.  But Riley cites Brooks for a rule unrelated to the presumption of receipt of posted material; instead, Riley uses Brooks for the proposition that contractual conditions governing contract cancellation are to be "strictly construed and strictly performed."  Id.  Rather than aiding Mr. Goldstein's cause, Riley actually works against him by reaffirming the presumption that posted material has been received by the material's addressee.  Id. (noting that a properly addressed notice, when posted via ordinary mail, is entitled to the "presumption . . . that in the due course of the mail service [the notice] was delivered at the place addressed.").  The law of Maryland is accurately recited in

Benner, and the Court does not believe Brooks and Riley support a different rule.

In this case, the ordinary business practices employed by Lincoln National establish a presumption that the July 3rd Notice was both sent and received. Lincoln National uses a fully automated system to issue all of its policy notices. The policy notices are automatically generated and printed daily by Lincoln National's mainframe computer. The notices are then transferred to a separate machine where they are folded, stuffed and sealed into windowed envelopes. The machine affixes the necessary postage, and the envelopes are placed into a mail receptacle for pickup and delivery by the postal service.

Throughout the process, Lincoln National stores a record of every notice generated and mailed in a database known as "COLD" (Computer Output to Laser Disk). The COLD database produces a "Correspondence Activity Report" every day, which details among other things each notice generated and each notice's primary addressee. From these records, Lincoln National is able to reproduce every notice it has sent. If and when the postal service returns a policy notice to Lincoln National because the notice is undeliverable, Lincoln National scans the notice into another system called the Automated Work Distributor (AWD), after which a customer service representative works to resolve the issue. The AWD, therefore, contains a record of any Lincoln

9

National notice that was mailed but not received by the notice's primary addressee, provided the postal service returned the notice to Lincoln National.

Lincoln National's COLD database contains a record of the July 3rd Notice, which indicates that the notice was both properly generated and mailed. As the record appears in the COLD database, the July 3rd Notice was correctly addressed to Mr. Goldstein. The Correspondence Activity Report for July 3, 2007, also indicates the July 3rd Notice was generated and mailed. In addition, the AWD system has no record that the July 3rd Notice was returned to Lincoln National as undeliverable. And finally, Lincoln National has no indication of any systemic problem affecting the creation or mailing of notices on July 3, 2007. In sum, Lincoln National has established that its ordinary business practices are sufficient to create the presumption that the July 3rd Notice was properly mailed and received by Mr. Goldstein.

To rebut this presumption, Mr. Goldstein relies primarily on his assertion that he simply did not receive the July 3rd Notice. Aware his bare denial is insufficient to overcome the presumption, Mr. Goldstein points to several other facts and circumstances he claims give rise to a genuine dispute of material fact. First, Mr. Goldstein cites a letter Lincoln National submitted in opposition to Mr. Goldstein's MIA

complaint, in which a representative of Lincoln National noted "the last premium notice [from Lincoln National to Mr. Goldstein] was mailed on 3/19/07."  Pl.'s Resp. at 11, ECF No. 45-1.  While undisputed, this fact is inapposite, because a "premium notice" is different from a "grace period notice," and only the latter is relevant here.  Thus, the letter provides no support for Mr. Goldstein's contention that he did not receive the July 3rd Notice.

Next, Mr. Goldstein argues that the absence of a record of the July 3rd Notice in the AWD system is "conspicuous" and offers proof that the July 3rd Notice was never sent.  Pl.'s Resp. at 12, ECF No. 45-1.  Although the AWD system contains a record of the very first grace period notice mailed to Mr. Goldstein in February 2005, Lincoln National stopped scanning and entering such notices into the AWD system by 2006.  Def.'s Reply at 8, ECF No. 47.  Absent exceptional circumstances, Lincoln National does not store copies of grace period notices in the AWD system, and in fact several other grace period notices sent to and received by Mr. Goldstein after February 2005 are also absent from the AWD system.  The absence of the July 3rd Notice from the AWD system is unremarkable.

Last, Mr. Goldstein proffers a series of minor and unsupported protests that are no more successful.  He argues that Lincoln National's automated systems, which Lincoln

National has never fully audited, should not be trusted, but he provides no evidence that the systems ever malfunctioned. Pl.'s Resp. at 13, ECF No. 45-1. Mr. Goldstein also submits that, since the inception of the Policy in 1985, he never failed to remit a payment for which he received a notice. Id. at 12. Even so, Mr. Goldstein failed to adjust his planned semi-annual premium payments despite knowing as early as 1998 that his payments were too low, and Mr. Goldstein also consistently failed from 2005 to 2007 to ensure his cash value was adequate to cover the Policy's monthly expenses. In this way, Mr. Goldstein was frequently delinquent for nearly two years, so his earlier laudable record of responding to Lincoln National's notices is unpersuasive.

In sum, Lincoln National's ordinary business practices are sufficient to establish the presumption that Mr. Goldstein received the July 3rd Notice, and Mr. Goldstein has not presented evidence sufficient to rebut that presumption. As Mr. Goldstein's wrongful termination claim is contingent exclusively upon his unsustainable allegation that he did not receive the July 3rd Notice, Lincoln National is entitled to summary judgment on this claim.

**IV. LINCOLN NATIONAL'S REFUSAL TO REINSTATE THE POLICY**

Mr. Goldstein's second claim involves Lincoln National's refusal to reinstate the Policy. The language of the Policy provides:

> If this policy terminates because a premium or other required amount is not paid . . . it may be reinstated. Reinstatement may be made at any time within five years from the date of termination . . . . <u>Satisfactory evidence of insurability must be furnished at that time.</u>

(emphasis added.) Mr. Goldstein suggests this clause means Lincoln National must reinstate the Policy so long as Mr. Goldstein provides evidence that he is "insurable" at any rate or under any policy. Lincoln National disagrees and argues instead that the clause has a specific, well defined interpretation when used in life insurance policies, and that it entitles Mr. Goldstein to reinstatement only if he provides evidence that he is insurable at the rate at which the Policy was first issued.

"An insurance company generally is entitled to determine the risks it considers profitable to insure. . . . The insurer is at liberty to choose its own risks and may accept or reject applicants as it sees fit." <u>Mitchell v. AARP Life Ins. Program, New York Life Ins. Co.</u>, 779 A.2d 1061, 1070 (Md. 2001) (internal quotations omitted). "Satisfactory evidence of insurability" is an objective standard of reasonableness. <u>Id.</u> at 1075; <u>Funk v. Franklin Life Ins. Co.</u>, 392 F.2d 913, 917 (7th Cir. 1968).

13

Thus, "[w]hen the insured has a contractual right to reinstatement that depends on the insured's furnishing evidence of insurability, which is 'satisfactory' or 'satisfactory to the company,' by weight of authority an objective standard applies—the evidence need only be that which would be satisfactory to a reasonable insurer." 29 Eric Mills Holmes, Holmes' Appleman on Insurance, 2d § 179.03[D][4]. "[W]here the policy provides for reinstatement only on satisfactory evidence of insurability, the insurer has the same rights as upon an original application." Thomas F. Segalla, Couch on Insurance § 33.72 (3d ed. 1995). In a dispute regarding a plaintiff's insurability, "[t]he burden is . . . on the plaintiff to show that the proposed insured met the objective test of insurability." Mitchell, 779 A.2d at 1075 (quoting Simpson v. Prudential Ins. Co., 177 A.2d 417, 425 (Md. 1962)).

Mr. Goldstein's Policy required "satisfactory evidence of insurability" before reinstatement, which is to say the Policy required Mr. Goldstein to submit evidence sufficient to show a reasonable insurer would underwrite him. In the context of the Policy's reinstatement provision, this necessarily means Mr. Goldstein had to show he was insurable at the rate at which the Policy was first issued. To hold otherwise would eviscerate the reasonableness standard, because no objectively reasonable insurance company would issue a standard rate policy—that is to

14

say, a policy reserved for healthy individuals—to a high-risk individual of poor or failing health. Under Maryland law, therefore, Mr. Goldstein had the burden of proving he met the objective standard of insurability for a standard-rate policy.

In this case, Mr. Goldstein was unable to meet his burden. His reinstatement application indicated he was overweight and under treatment for hypertension, sleep apnea, hyperlipidemia, and diabetes, from none of which he suffered when the Policy was first issued. In short, Mr. Goldstein's health had deteriorated significantly since the Policy's inception in 1985. Given Mr. Goldstein's significantly changed circumstances, Lincoln National's refusal to reinstate his standard-rate policy was eminently reasonable as a matter of law. That two other insurance companies have also recently refused to insure Mr. Goldstein's life only supports Lincoln National's reasonableness. Def.'s Mot. Summ. J., Ex. J (Pl.'s Answers to Interrogs. ¶ 6), ECF No. 44-12.

In light of the significant body of case law interpreting the phrase "satisfactory evidence of insurability" within the context of life insurance policies, Mr. Goldstein's argument that the Policy requires mere insurability at any rate and not insurability at the Policy rate must fail. This question has been litigated in Maryland, and the meaning of that phrase—as well as the underwriting standard announced by it—is well

established.  Moreover, Mr. Goldstein cites no precedent advancing his position.  While his argument may seem compelling if divorced from the common law governing life insurance polices, it is wholly unsupported by any legal authority.  Mr. Goldstein has submitted no evidence demonstrating a genuine dispute of material fact, and Lincoln National is entitled to summary judgment as a matter of law.  Accordingly, Lincoln National's motion will also be granted on this issue.

## V. CONCLUSION

For the foregoing reasons, Lincoln National's Motion for Summary Judgment, ECF No. 44, will be granted.  A separate order will issue.

_____/s/_____
William M. Nickerson
Senior United States District Judge

January 4, 2011